**[Cite as *In re L.K.*, 2022-Ohio-1857.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re L.K., Z.K., M.W., H.K.

Court of Appeals No. L-21-1117

Trial Court No. JC 20282502

**DECISION AND JUDGMENT**

Decided: June 2, 2022

* * * * *

Anthony R. McGeorge, for appellee.

Frank J. Simmons, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, J.K. ("mother"), appeals the May 10, 2021 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of her children, L.K. ("child 1"), Z.K. ("child 2"), M.W.

("child 3"), and H.K. ("child 4"), to appellee, Lucas County Children Services ("LCCS"). The trial court also terminated the parental rights of J.W., the legal father of child 1 and alleged father of child 2, and S.W. ("father"), the legal father of child 3 and alleged father of child 4. Neither father is a party to this appeal. For the following reasons, we affirm.

## I. Background and Facts

### A. The referral and complaint

{¶ 2} On December 18, 2020, LCCS sought, and the trial court granted, an ex parte order giving LCCS custody of the children. According to the order, child 3 was taken to the emergency room because she was unresponsive. The doctor found new and old bruises and fractures over child 3's body and was concerned that she was the victim of physical abuse. Mother refused to allow the older children to speak to the LCCS investigator. The trial court found that there was probable cause to believe that the children were in immediate danger and that removal from mother's home was needed to prevent immediate or threatened physical or emotional harm to the children.

{¶ 3} On December 22, 2020, LCCS filed a complaint seeking temporary custody of the children. The agency alleged that, on December 18, 2020, child 3 had a seizure and was unresponsive. She was taken to the hospital for treatment where doctors discovered that she was severely hypothermic—with a body temperature of 79 degrees— and had numerous injuries, including (1) bruises in various stages of healing on her hip and buttock that the trauma doctor believed were the result of being spanked too hard, (2)

2.

an acute fracture on the back left of her skull, (3) subacute healing fractures of her eighth and ninth ribs on both sides, and (4) a deformity of her left humerus, which suggested a remote fracture. The results from child 3's CT scan, which discovered her various fractures, "noted that the constellation of findings is highly suspicious for non-accidental trauma." When Abigail Galligan, an LCCS caseworker, spoke to mother about child 3's injuries, mother said that child 3 fell down the stairs, which caused the bruising, but she was unable to explain why the child's body temperature was so low.

{¶ 4} LCCS also noted that the family had a history with the agency (the "2018 case"). In June 2018, the trial court adjudicated at least one of the children abused and awarded LCCS temporary custody of child 1, child 2, and child 3. Mother did not complete her case plan services in the 2018 case, so the trial court awarded legal custody of the three oldest children to a relative in July 2019. Mother regained custody of child 1, child 2, and child 3 on August 20, 2020.

{¶ 5} LCCS included a motion for an emergency shelter care hearing with the complaint in which it requested emergency interim custody of the children. A magistrate held an emergency hearing the day the complaint was filed and awarded LCCS interim temporary custody of the children.

{¶ 6} On January 12, 2021, the agency filed an amended complaint that was identical to the original complaint except that it sought permanent custody of the children rather than temporary custody.

3.

## B. The adjudication hearing

{¶ 7} The trial court held the adjudication hearing on February 8 and 10, 2021. At the hearing, LCCS presented the testimony of Dr. Randall Schlievert, an expert in child abuse, and Galligan, an assessment caseworker for LCCS. Mother presented the testimony of Jo.K. ("grandfather"), her father, and testified in her own behalf.

### 1. Dr. Schlievert's testimony

{¶ 8} Schlievert, the director of the child abuse program at Mercy Health St. Vincent Hospital in Toledo, testified that he was consulted to evaluate child 3 when she was an inpatient at the hospital in December 2020. His involvement in child 3's case included physically examining her, reviewing her x-rays and records, and meeting with her medical care team, which led him to request some additional tests. He described child 3's condition and injuries at the time of her hospitalization as follows:

> She had a left-sided skull fracture in the back of the head. That was fresh, meaning that there was some swelling over the fracture of the scalp. There were bilateral rib fractures in the posterior rib region of 8 and 9, so at least four. The left humerus, although it's not 100 percent but certainly there was given in the context of the case evidence of an older healing fracture of the left humerus. She was admitted primarily for a seizure that had been going on. And the biggest concern overall besides the physical were [sic] the fact that her temperature when she arrived at the hospital was

4.

79 degrees rectally, and she required extensive rewarming. And the

temperature is not consistent with the history that was provided * * *.

Something obviously more significant was going on that caused that kind

of level of body temperature reduction.

   * * *

  [S]he also had fresh bruising on her right buttock and hip and

posterior leg.

Schlievert said that a normal temperature range for a child was approximately 97 to 99

degrees. A body temperature as low as child 3's was life threatening.

{¶ 9} LCCS asked Schlievert to describe each of child 3's injuries and his

conclusions about them in detail, beginning with the hypothermia. According to

Schlievert, the explanation that mother provided for child 3's hypothermia did not

adequately explain how child 3's temperature got so low. Mother reported that child 3

had an accident in her bed, so mother put her in a bath with warm water to clean her up.

Mother went to "make cereal" for the other children, and when she returned, child 3

looked like she was having a seizure. Mother gave child 3 medicine to stop the seizure

and "commented that it seemed [child 3] was getting colder and colder so she called

some family to come over to watch the other kids while she called 911."

{¶ 10} Child 3 had a history of seizures that started in the fall of 2020, and was

prescribed medicine to treat them. Mother told the doctors that child 3 had not taken the

5.

medicine for approximately four days before this incident because mother ran out; she also said that she had called the child's neurologist for a refill, but had not heard back. In response to a question about a correlation between seizures and body temperature, Schlievert said that he had seen patients with elevated body temperatures as a result of the muscle contractions that happen during a seizure, and that seizures caused by a brain injury involving the part of the brain that regulates temperature "may" result in a lower body temperature, but he was "not aware of anything of this level of 79 or 80 degrees."

{¶ 11} Schlievert was not able to give a definite amount of time that it would take for a person's temperature to reach 79 degrees because too many variables—such as the temperature and depth of the water and the room temperature—would affect the answer, but it "certainly wouldn't happen in minutes * * *." Schlievert also said that it did not "make sense" that mother described the bath water as "warm."

{¶ 12} Regarding child 3's skull fracture, Schlievert testified that it was "fresh," meaning that it happened from minutes to approximately five days before the CT scan. He said that it was "possible" that child 3 sustained the fracture from falling and hitting her head during the seizure. But he also said that this would not explain all of child 3's other injuries and that "[a]t this point I generally have to look at everything in context. There is [sic] highly suspicious injuries and findings, and it's possible that the skull fracture may have been an abusive event and that caused the fracture and the seizure due to the brain being injured. Either one is possible."

6.

{¶ 13} Regarding child 3's rib fractures, Schlievert explained that "bilateral" meant that child 3 had fractures on both sides of her ribcage at the eighth and ninth ribs, for a total of four fractured ribs. He described these fractures as "healing," which meant that they happened at least seven to ten days before, but no more than eight to 12 weeks before, the CT scan. Based on their appearance, he estimated that child 3's rib fractures were in the range of two to eight weeks old. When asked by LCCS if the fractures appeared consistent with an injury that happened in August 2020, Schlievert said that they did not; more than three and one-half months had passed between August and the date of the CT scan, which was "plenty of time for any healing rib fracture to go back to a normal appearance."

{¶ 14} Regarding the probable fracture of child 3's humerus, Schlievert said that it was "remodeling," which he described as "thickening and irregularity of the shaft of the humerus." He explained that the irregularity, standing alone, would not necessarily indicate an injury, but the lack of other explanations in child 3's medical records—such as rickets or a healing infection—meant that it was "logical to conclude, medically, that it's a healing injury." However, he could not "say with definition [sic] * * *" that he knew that the humerus finding "was a fracture like [he could] with the other injuries."

{¶ 15} And regarding the bruising, Schlievert said that child 3 had deep bruises on her "right hip, buttock, and posterior thigh" that could have been "minutes old to several days old[,]" although he said that there "really is no way to do stages of healing * * *" for

7.

bruises. He opined that it could take "two or three weeks for something like that to resolve[,]" but because child 3 had an elevated level of a liver enzyme that indicates muscle damage, which "returned to normal over a short time * * *[,]" Schlievert believed that child 3's bruises were "probably fresher." But he said that it was "impossible" to date them with any more precision. He was certain that they were not from August 2020, however.

{¶ 16} Schlievert did not think that both the skull fracture and the bruises could have happened from child 3 falling in the bathtub because there were four different "contact points" on child 3's body that were injured that were "indifferent [sic] parts of the body, different planes and you're just not going to hit all those with force, you know, as part of a fall." Additionally, there are other areas with thinner skin and less padding—like knees and elbows—that would bruise more easily during a seizure, but child 3 did not have bruises in those areas. Once again, Schlievert said that the injury "just doesn't make sense."

{¶ 17} Based on everything that he knew about child 3's case, Schlievert concluded that "[o]verall it was likely nonaccidental trauma based on the injuries and findings that she had[,]" and that "we are dealing with likely inflicted injuries to the bone, skin and some type of other prolonged emersion, a cold liquid or some other cause that would cause such a significant reduction in body temperature." Schlievert also concluded that child 3's injuries were not inflicted all at once.

8.

{¶ 18} On cross-examination, Schlievert conceded that child 3 had a history of failure to thrive and demonstrated characteristics consistent with "autistic behavior," although he did not recall seeing anything in her medical records about autistic findings. He said that he had seen cases of autistic children who had injured themselves, and that a fall down stairs or possibly out of a highchair would not be inconsistent with autism.

{¶ 19} Schlievert was not aware of any medical issues underlying a failure to thrive diagnosis that would affect a child's ability to regulate her body temperature or "would make the body temperature, especially one time, go down to 79 degrees. I mean, that's almost incompatible with life at some level." There are certain medical conditions that can cause a person's temperature to be lower, "but we're talking a degree off of normal. We're not talking 20 degrees off normal."

{¶ 20} Schlievert did not believe that the bruising on child 3's body could have come from a fall down the stairs because the bruises were in

soft areas that are extremely padded. They're protected areas. So if you were to fall down the steps, you may hit your hip and there may be bony prominences within skin over that where you bruise, shins, knees, elbows, but not the back of your thigh. I just don't see how the back of your thigh is hitting the stair in a fall. There's just too many different locations to be accounted for by a stair fall.

9.

{¶ 21} Relative to the rib fractures, Schlievert described child 3 as "tiny" and said that she was in the fifth percentile for weight, meaning that 95 percent of all children her age weigh more than her. He did not recall seeing in child 3's medical records she had received CPR in October 2020, but he did not dispute that it had happened. And, although he had seen a very small child who was injured during CPR, he said that studies have concluded "it is very, very rare, but it's not impossible that there can be a fracture of the rib in infants or toddlers undergoing CPR."

{¶ 22} Schlievert also clarified what he meant about considering the finding on child 3's humerus "in context." He explained,

> If I was just made aware of this arm finding in isolation and someone said what is this from, Doctor, I would say it could be a healing injury, a healing fracture. And then of course it could be an accidental fracture or a nonaccidental fracture. It could be the signs of bone healing because of low vitamin D, low copper. It could be a bone healing from an infection. * * * And there may just be some extremely rare genetic things that would look like that, but then you would see other findings.
>
> * * *
>
> But in the end if you were to say, well, there's something there, what I do have is at least the context of her situation in December. And it is a context of extreme life threatening hypothermia that is not explained by the

10.

history; fractures that, overall, are not explained adequately by history, bruising not explained by history, a high risk situation. The medical records document that mom expressed that she was overwhelmed in caring for this child and that this child had a bowel accident. Those things are areas where we do see inflicted injuries occur. So with all of that, I do think medically it's fair to say that the arm is likely a fracture as well. I say that also because if there had been an infection, you would have had fever, pain, refusal to use the arm, and you would have sought care—should have. But it's not unusual for an inflicted injury to be had and care not to be sought.

Schlievert also said that he had child 3 tested for some of the genetic issues, and the tests came back negative.

{¶ 23} As Schlievert alluded to, child 3's records from her emergency room visit, which were admitted into evidence, state that mother reported that she had been out of child 3's seizure medicine for "approximately 1 week. * * * Mother states she feels overwhelmed because [child 3] is 'not a normal kid' and she feels like 'she has to watch her all the time', and states 'it's hard because [child 3] gets into everything, and hurts herself often.' Mother subsequently shows examiner all the scars from where [child 3] has hurt herself." There is also a note that child 3's seizures in October 2020 "were from breath holding and not of brain origin."

11.

{¶ 24} When mother's attorney asked Schlievert if his opinion would change if he knew that child 3 was not receiving appropriate medical while she was in the custody of her relative—indicating that child 3 might have medical issues that are not accurately reflected in her medical records—Schlievert again referred to the finding on child 3's humerus. He said that the appearance of the bone indicated that whatever caused the finding happened after August 2020, when child 3 was back in mother's custody. He used August 2020 as a reference point because mother called the hospital about three days after child 3 was admitted and told a nurse that "the fractures were due to the foster parents, which would have been back in August." He elaborated,

> So if it was an accidental injury, * * * I would expect a parent to be able to tell that there is something wrong. They may not know what, but this child would be in pain. They would not be using their arm normally no matter if it was an inflicted or non-inflicted fracture. And there is, to me, no evidence that care had been sought for an injury like that. If there would have been infection, you would have had the fever, pain something to a parent that would have said there is something wrong with the arm, I don't know what. And a parent wouldn't know what necessarily, but there was nothing that I know of [from the medical records] done back then.

{¶ 25} Schlievert was certain that all of child 3's fractures had happened within the 12 weeks before she was admitted to the hospital. He said that, although he might see

12.

some curvature or deformity of a bone from an older fracture, he would not see signs of healing in a fracture beyond 12 weeks.  So, if any of child 3's fractures had happened in June or July of 2020, by December, "[t]hey would have gone through their course of healing and that would have resolved."

{¶ 26} On redirect, Schlievert clarified that child 3's failure-to-thrive diagnosis was "just a static one-time evaluation, and [he] had no evidence that she was not gaining weight properly."  He also explained that the eighth and ninth ribs are in the lower third of the rib cage, over the lower chest and upper abdomen—not the sternum, where CPR is administered—so it would not be common for fractures of those ribs to happen. Generally, the most common injury to children who receive CPR is bruising, but rib fractures were reported "maybe [] less than five percent of the time * * *."

### 2. Galligan's testimony

{¶ 27} The state's other witness was Galligan, the assessment caseworker for LCCS.  She testified that she became involved with the children when she went to the hospital to speak to mother about the bruising on child 3's buttock and hip.  Mother explained that the bruising was from child 3 falling down the stairs.  She did not offer any explanation for child 3's hypothermia.  Mother also reported that child 3 had a seizure and was taken to the hospital in October 2020.  Child 3 was prescribed medicine for the seizures.  Galligan did not know whether child 3 was current on her medicine on December 18.

13.

**{¶ 28}** At that point, the hospital had not conducted child 3's full-body CT scan, and Galligan was not aware of the child's fractures, so she and her supervisor decided to put the children on a safety plan that required the children to reside with someone other than mother and prevented mother from having unsupervised contact with the children. However, while Galligan was checking the proposed residence for the safety plan, the results of the CT scan came in, which resulted in LCCS seeking the ex parte custody order. The children were placed with Ja.W. ("grandmother"), the paternal grandmother of child 1 and child 2.

**{¶ 29}** Galligan did not interview child 3 during her investigation because she was very young and nonverbal. She was only able to speak to child 1 and child 2 briefly while at the proposed residence for the safety plan, and the children each told her that "mom had told them not to tell anybody the reason that their sister was in the hospital."

**{¶ 30}** Galligan explained that LCCS was involved with the family in the 2018 case where mother lost legal custody of the children because the trial court adjudicated child 1 and child 2 abused. The case involved physical abuse, primarily against child 1, and domestic violence between mother and father. Mother and father participated in that case (J.W., the legal father of child 1 and alleged father of child 2, did not), but neither one completed their case plan services. Galligan knew of at least one incident of domestic violence by father that mother reported in August 2020, just before she regained custody of the children.

14.

**{¶ 31}** On cross-examination, Galligan acknowledged that mother had completed the domestic-violence-survivor classes required by the case plan in the 2018 case and admitted that she and father had a history that had led to the family's prior agency involvement. Galligan was not aware of any other reports of injuries to child 3 between October and her hospitalization in December.

### 3. Mother's testimony

**{¶ 32}** Mother testified in her own behalf at the adjudication hearing. Mother acknowledged that she had lost custody of the children in the 2018 case because she did not complete her case plan services—with the exception of the domestic-violence-survivor classes. She later admitted that she had reported father to police for assaulting her three times since completing the classes. According to the criminal complaints that LCCS offered into evidence, two of the incidents happened at father's home and one happened at mother's home, and, although one of the incidents was before mother regained custody of the children, the other two happened while this case was pending in the trial court, just eight days before the adjudication hearing.

**{¶ 33}** Regarding child 3, mother testified that she got all of her children back from grandmother's custody on August 20, 2020. Mother said that child 3 came back to her "horrible"; child 3 was "nonverbal. She was not talking at all, didn't understand anything that she was saying. * * * [S]he just came back as—just picture a dog on a

15.

commercial that was skin and bones asking for donations. That's the way my child came back to me, smelling real bad, hair not—it was just horrible."

{¶ 34} Mother made an appointment with child 3's doctor because she was concerned with the child's condition. The doctor referred child 3 to a neurologist, an autism specialist, and Help Me Grow. Mother said that child 3 was "born with failure to thrive * * *" and was smaller than average because of a virus that mother contracted while she was pregnant.

{¶ 35} Mother also had concerns about child 3 while she was in grandmother's custody, including in December 2019, when mother noticed a problem with child 3's left arm. Mother described the arm as "limp" and said that "we could not touch it. We couldn't hold her or grab her." Mother claimed that she had anonymously reported her concerns to LCCS, but nothing was done about them. Mother did not have concerns about child 1 and child 2 while they were in grandmother's care.

{¶ 36} In October 2020, child 3 had her first seizure while sitting in a highchair at mother's residence. While she was seizing, child 3 slid out of the chair and hit her head on a stool. Mother called 911 and performed CPR on child 3 while she waited for an ambulance. When the EMTs arrived, they took over CPR and took child 3 to the hospital. During her hospital stay, child 3 was not given any x-rays; the only test the doctors performed was one to "measure when [child 3] had a seizure or when a seizure would occur."

16.

{¶ 37} Other than the seizures, mother had noticed "signs" of "[a]ustism" with child 3, including her mood being "very off," delayed speech, and aggression toward herself and others. She also said that child 3 was always cold to the touch, and mother had to dress her in layers of clothing to keep her warm.

{¶ 38} Mother testified that, on the morning of December 18, 2020, child 1 told her that child 3 had "used the bathroom on herself, * * *" so mother went upstairs to clean up the mess and gave child 3 a bath that lasted "no more than 20 minutes." Mother said that "the temperature of the tub was warm. Even the paramedic checked the temperature." While child 3 was in the bathtub, mother went to the stairs to call the other children to get something to eat, and when she went back to check on child 3—which she said was no more than one to one and one-half minutes later—child 3 was having a seizure. She found the child sitting "on her butt leaning, like, on the back of the tub." Mother pulled her out of the tub and "put the ointment in her bottom." While mother was doing this, she said that child 3's "temperature was dropping. She was not getting warm * * *." Mother did not know what was going on, so she called 911.

{¶ 39} The next day, mother was first able to speak to child 3's doctor. She said that she was "unaware" of all of the injuries to child 3, so she asked about possible sources for the injuries. According to mother the doctor told her that the CPR from October "maybe" could have caused the rib fractures, but the doctor "don't [sic] know." The doctor also said the injury to child 3's arm "was old." And child 3 "could have hit

17.

her head in the process of having the seizure. We don't know." The doctor also explained to mother that mother would have to speak to her caseworker going forward because mother was no longer allowed at the hospital.

{¶ 40} Regarding the bruising, mother testified that she reported to LCCS, on the day that child 3 went to the hospital, that child 3 had fallen down the stairs several days earlier. She described the stairs in her house as "very steep" and said that they have "[b]etween 20 and 25" steps. She did not have baby gates blocking the stairs because she had just moved into the home and "just didn't get a chance to." Mother did not witness the fall, but heard child 3 crying, and child 1 told mother that child 3 fell. Mother claimed that child 3 told mother that she was okay, so mother "put her down and she just started running around the house all over again." Mother also said that she did not know anything about the bruising because the bruise "was never there before." Mother denied spanking her children as a form of punishment; rather, she would put them in the corner for two minutes or make the older two children "bedbound" for 30 minutes, which meant sitting on their beds without snacks, toys, or watching television.

{¶ 41} Mother denied that child 3 ever exhibited any signs that she was in pain because of the bruises and fractures that the doctors found. The only time she saw child 3 in pain was a year earlier when the child was in grandmother's custody and her arm was "limp."

18.

{¶ 42} Mother testified that "[n]ever was [she] ever frustrated with [child 3,]" and that she "always had time and patience for [child 3] * * * [and] was more loving and caring and nurturing to her." She denied causing any harm to child 3.

{¶ 43} On cross-examination, mother continued to deny that she "whooped" or "whipped" the children, despite the trial court's findings in the 2018 case adjudicating child 1 and child 2 abused, neglected, and dependent based on child 1 having (1) "a large red mark resembling a belt mark on her face"; (2) "bruising, swelling and red marks on both cheeks, her left eye was bruised with slight swelling noted, a cut/scratch on her ear and a raised bump behind her right ear"; and (3) "multiple red marks and bruising on her shoulder, back, and abdomen"; and child 2 having "bruising on the front left side of her neck, on her back, at the base of her skull, and a scabbed mark across the back of her neck." The judgment entry also notes that mother "admitted she had caused the injuries to the children." Mother testified that, although the court found that the children were abused, "[t]hey were unsure of who did the abuse," i.e., whether mother or father was responsible.

{¶ 44} Regarding child 3's medical issues, mother admitted that she did not provide her attorney or LCCS with any records from the child's primary care doctor to support her claims. Mother could not explain why child 3's medical records did not contain information from the October 2020 hospital visit.

19.

{¶ 45} Mother explained that she tried to get child 3's seizure medicine refilled, and had called the neurologist's office "numerous" times, but it was a special prescription that had to be mixed and delivered to the hospital; it "wasn't that [she] just had to go to the pharmacy" to get it.

{¶ 46} Mother's explanation to the medical staff at the hospital was that child 3 "was having a seizure * * * in the tub. I don't know why her temperature dropped. I put that thing in her bottom. I don't know why this stuff occurred." She thought that child 3's skull fracture might have happened "[b]ecause of her having the seizure, she could have hit her head in the tub. I'm clueless just like you." Mother did not report hearing any thud, bang, or loud noise from the bathroom while calling to the other children, despite the bathroom and the stairs being near each other.

{¶ 47} As mother summarized her explanations for child 3's injuries: "Her ribs I know are from CPR. Her arm, I am not sure. It happened before my care. Her head had to have happened from her having her seizures. And her bruise had to have happened from her falling down the stairs on [the] Wednesday [before she was admitted to the hospital]."

### 4. Grandfather's testimony

{¶ 48} Mother's final witness at the adjudication hearing was her father. He testified that he never saw mother "[w]hoop[]" any of the children. And, although mother would "get[] angry every now and then[,]" grandfather had "never seen her abuse

20.

her children." He said that "she was the type of mother that would always—it was always food in the house. Her kids dress better than mine, you know. She would always make sure they had decent stuff."

{¶ 49} Grandfather could not remember any time while child 3 was in grandmother's custody that the child was injured, but he recalled a time when "she would not basically cry, but you could tell—you could tell that she didn't want you to hold her in certain positions and stuff." She was also irritable, and it was difficult to get her to eat. Grandfather could tell that "there was something wrong with her, but [he] couldn't basically put a finger on it." He recalled that this happened near the end of June 2020.

{¶ 50} Grandfather was not present either in October or December 2020 when child 3 had seizures.

### 5. Adjudication decision

{¶ 51} In its March 1, 2021 adjudication judgment entry, the trial court recapped the hearing testimony from Schlievert and mother regarding child 3's injuries. The court credited Schlievert's testimony that it was unlikely that child 3's injuries were accidental; the court found "none of [mother's] explanations for the child's injuries to be believable."

{¶ 52} The court also noted that (1) mother admitted that child 3 had not received her seizure medicine for approximately four days before she was hospitalized because mother did not refill the prescription; (2) the children's bedrooms were on the second floor of mother's home and mother's bedroom was on the first floor, but she did not have

21.

baby gates blocking the steep stairs, despite having a two-year-old and one-year-old in the house; (3) the court had adjudicated child 1 and child 2 neglected and abused, and child 1, child 2, and child 3 dependent in the 2018 case; and (4) despite completing domestic-violence-survivor classes as part of her case plan in the 2018 case, mother continued to "be involved with" father, her abuser.

{¶ 53} The court determined that the facts showed, by clear and convincing evidence, that child 3 was neglected under R.C. 2151.03(A)(3) and (6) and abused under R.C. 2151.031(C), and all four children were dependent under R.C. 2151.04(C) and (D).

{¶ 54} With regard to the neglect finding, the court concluded that mother failed to provide proper or necessary medical care for child 3 because she did not refill the child's seizure medicine, child 3 was without her medicine for approximately four days, and child 3 had a seizure while alone in a bathtub. The court also found that mother failed to properly care for child 3, which caused child 3 to suffer severe hypothermia. As the court concluded, "[w]hile the truth of what happened to cause [child 3's] body temperature [to drop] remains unknown, it is undoubtedly true that [child 3] was exposed to a prolonged source of cold, as noted by Dr. Schlievert."

{¶ 55} As to the abuse finding, the court pointed to child 3's severe hypothermia, bruising, and fractures at the time she was hospitalized, and determined that mother failed to "offer any plausible explanation for how [child 3] became hypothermic." The court

22.

agreed with Schlievert's expert opinion that child 3 was likely immersed in cold water for a period of time or exposed to some other prolonged source of cold.

{¶ 56} And regarding the dependency findings, the court concluded that

it is apparent from both the nature and extent of the injuries to [child 3] and [mother's] continued contact with [father], that the children's condition or environment warrants the LCCS assuming the children's guardianship. [Child 3] suffered severe injuries while she was in the care, custody, and/or control of [mother]. [Mother] created substantial and serious risks to the health, safety, and well-being of her children. These risks include her failure to refill [child 3's] seizure medication and place even the most basic safety precautions throughout her home (e.g., installing safety gates on a steep flight of stairs for two-year-old and one-year-old children).

### C. The disposition hearing

{¶ 57} On April 19 and 20, 2021, the trial court held the disposition hearing. At the hearing, LCCS presented the testimony of Jenny Monroe-Wells, a caseworker for LCCS, T.T. ("foster mother"), the children's foster mother, and the guardian ad litem

23.

("GAL"). Mother presented the testimony of Montarey Barbour-Richardson, the children's former childcare provider, and testified in her own behalf.[1]

### 1. Monroe-Wells's testimony

{¶ 58} Monroe-Wells testified that the family first became involved with LCCS in 2018 after Franklin County Children Services received a referral about domestic violence between mother and father, and then could not locate the family. LCCS asked the Toledo Police Department to do a welfare check on child 1 and child 2,[2] and the officers arrested child 1 and child 2 "for safekeeping" because they found marks on the children. The marks on child 1 included "a red mark on her face resembling a belt mark, bruising on both cheeks, bruise and a slight swell on her left eye. Bruising and red marks on her back, shoulder and abdomen as well as a red scratch behind her right ear." The marks on child 2 included "a bruise on her left front side of her neck, bruising on her back at the base of her skull and a scab mark on her back." The trial court ultimately adjudicated both children abused, neglected, and dependent, and child 3 (who was born during the pendency of the case) dependent. The court awarded legal custody of the children to grandmother.

---

[1] Grandmother filed a motion for legal custody that was consolidated for trial with LCCS's motion for permanent custody. The trial court's decision on grandmother's motion is not before us on appeal, so we will confine our discussion of the facts of the disposition hearing to those relevant to the motion for permanent custody.

[2] Child 3 and child 4 were not yet born at the time LCCS opened the 2018 case.

{¶ 59} While the 2018 case was pending, LCCS offered mother case plan services that included domestic-violence-survivor classes, housing assistance, mental health services, and parenting classes. Mother completed the domestic-violence-survivor classes, but did not complete any other case plan services; she began mental health services and parenting classes, but stopped attending, and initially obtained housing, but was evicted while the 2018 case was pending. During the course of this case, mother reengaged with mental health services and was attending therapy once a week.

{¶ 60} Monroe-Wells also reported that there were ongoing concerns about domestic violence between mother and father. Specifically, mother reported father for domestic violence in February of 2019, August of 2020, and January 2021. Monroe-Wells believed that domestic violence incidents between mother and father would continue, despite mother completing the domestic-violence-survivor classes.

{¶ 61} Monroe-Wells also briefly recapped the circumstances surrounding child 3's December 2020 hospitalization and the medical findings that led to LCCS opening this case and the trial court's March 2021 adjudication. She agreed that it was "concerning" for the agency that abuse allegations were made against mother in 2018, and then similar allegations were made against her in 2020.

{¶ 62} Mother was regularly visiting with the children, and the children were regularly exhibiting "negative behavior" following the visits. Monroe-Wells said that child 3 and child 4 "are very clingy, hard to console, cry." Child 1 and child 2 exhibited

25.

more extreme behaviors, such as "not following house rules. They're more physical to each other. * * * [T]hey've spit on each other and have destroyed or wrecked their room * * * just throwing things all over, breaking things." Child 1 also exhibited some negative behaviors at school, which were improving, and was going to have to repeat her current grade.

{¶ 63} At the time of the hearing, the children were placed with a licensed foster family. Other than the behavior issues after visits with mother, Monroe-Wells said that the children were doing well in their placement, and that they trusted and were opening up to their foster parent. While in the foster home, child 1 and child 2 disclosed the extent of the physical abuse they suffered in mother's home:

> They've disclosed that mother had sat on them, held them down, that mother punched them in their stomach with her fists. That she would kick them when they were done. That she would use a wooden piece of wood, whether it was a paddle to hit them in their head, back and buttocks.
>
> * * *
>
> There was a disclosure that mother did purposely push [child 3] down the steps, and that [child 3] would get hit a lot in the head.

Child 2 also made allegations of sexual abuse against father, and alleged that mother knew about the abuse. LCCS's investigation of the sexual abuse allegation was ongoing at the time of the hearing. Monroe-Wells explained that the children "were told by

26.

mother not to talk to the caseworkers[,]" so it had taken a long time for them to feel comfortable enough with her to make some of the disclosures that she testified to.

{¶ 64} Monroe-Wells claimed that LCCS was not recommending that the children be placed with grandmother because when grandmother had legal custody of child 1, child 2, and child 3 as a result of the 2018 case, "There were concerns reported that [grandmother] was only providing care for [child 1], that [child 2] and [child 3] were residing with [grandmother's] daughter [aunt]. While residing with [aunt], that [child 3] was physically abused by [J.W.]. That he would hit her, smack her. And at one point he also shoved food down her throat."

{¶ 65} On cross-examination, Monroe-Wells clarified that it was normal for children who are not placed with their parent to act out after visits, and that the children's negative behaviors after visits were not mother's "fault." She thought that the behaviors could be a result of "being triggered by seeing [mother] and acting out as a means of coping with that trauma that they've experienced. They're lashing out, and that's their way of coping with it."

{¶ 66} Monroe-Wells also elaborated on her concerns about ongoing domestic violence between mother and father. Although mother was the victim of the domestic violence incidents, mother continued to interact with father after completing her domestic-violence-survivor classes. In addition to the police reports mother had filed, the case notes from the 2018 case indicated that mother was seen getting out of father's car at

a family visit in January 2019 and told a caseworker in April 2019 that she was going to work on her relationship with father.

{¶ 67} Despite the disclosures that the children made about J.W. abusing child 3 while she was in grandmother's custody, Monroe-Wells did not believe that any of the injuries seen in December 2020 resulted from that abuse. That is, she attributed all of child 3's injuries in this case to mother, not a third party. She based this opinion primarily on Schlievert's testimony at the adjudication hearing because she is not a medical professional who could speak to how old injuries are.

{¶ 68} Monroe-Wells believed that the children loved mother, but LCCS was seeking permanent custody of the children for their "safety and well being [sic]."

### 2. T.T.'s testimony

{¶ 69} Foster mother testified that she is the children's foster parent, and that they had been placed with her for approximately four months.

{¶ 70} Foster mother discussed the children's behavioral issues as they related to visits with mother. Sometimes before visits, child 1 "would hit the other children if they didn't do what she wanted them to do. Sometimes [the children] would cry a lot. Sometimes they would say they didn't want to talk to their mom because they were afraid of her, scared of her." After visits, the children would "cry a lot and fight and scream and hurt each other. * * * They would actually, like, fistfight, punch, hit, slap." Child 3 would also scream from the time she left a visit with mother until she got to foster

28.

mother's home—which was more than an hour away. Child 2 was also inconsolable after visits, first saying that she wanted to go home with mother, then saying that she did not because she was "scared," "afraid of what mom will do to [them]," she did not "want to be beaten anymore," and asking "[c]an somebody make mom get help so she will stop hurting us?"

{¶ 71} In addition to their behavioral issues, both child 1 and child 2 were behind academically. Child 1's school wanted her to repeat her current grade, and when foster mother enrolled child 2 in kindergarten, the school moved her down to a pre-kindergarten class where she requires one-to-one staffing because of her behavior.

{¶ 72} Foster mother also testified to a number of disclosures of abuse that the children made to her after visits with mother. The children told her that

> mom would use something that they would call a piece of wood.
> Apparently it was a paddle. The children would disclose these things, how
> mom would—or boyfriend would hold the children up by their ankles while
> mom would punch them in their stomach. How [child 1] and [child 2] had
> disclosed to me about mom pushing [child 3] down the steps around the age
> of 2. She said because mom thought that [child 3] was slow, and mom
> didn't want to have any slow children. They would tell me about mom
> using ice cold baths as, like, some form of punishment for the children.

29.

Mom would sit on their heads and punch them in their stomach so that they wouldn't have bruises on the rest of their body.

She said that she had difficulty getting the three younger children to bathe because they were afraid of the ice-cold baths that mother used to make them take. It took child 2 about a month to be comfortable taking a bath, but child 3 and child 4 had "just recently" gotten comfortable doing so. Before that, "[t]hey would scream like it was the worse [sic] punishment ever."

{¶ 73} The only other information that foster mother wanted the court to be aware of was that "[t]he kids are afraid. They're—they said that if they go home, that [child 4] will be next to be beaten. They said that at the age of 2 is when mom usually starts beating the children."

{¶ 74} Since the children had come into foster mother's care, she had enrolled them in counseling, and child 3 and child 4 were receiving services through Early Intervention. She had noticed changes in the children since they first came to her. "When they first arrived, they kind of sat there and stared. There wasn't a lot of kid-like behaviors. * * * Now they get up, they run, they laugh. They go outside. They run in the yard. They love playing now. * * * They try to feed themselves. They try to dress their selves [sic]. The little ones of course are trying to dress themselves. * * * [Child 4] now is starting to talk."

30.

### 3. Barbour-Richardson's testimony

{¶ 75} In support of her case, mother called Barbour-Richardson, the owner of Believe Academy, where the children attended daycare from October or November of 2020 until LCCS took custody of them in December of 2020.  Barbour-Richardson saw mother interacting with the children every weekday during the months that the children attended Believe Academy.  She never thought that the children seemed afraid of mother or acted like they did not want to leave with mother.

{¶ 76} Barbour-Richardson and her staff kept a close eye on the children because a staff member used to work at the children's former daycare and told Barbour-Richardson that staff at the former daycare "kept an eye on * * *" the children because they "had a couple of issues with * * *" the children.  However, Barbour-Richardson never noticed any physical problems with child 3.  According to Barbour-Richardson, child 3 "never cried like she was pain [sic]" and "never * * * gave us any indication that there was anything going wrong."

{¶ 77} Barbour-Richardson did not know mother outside of their business relationship.  But based on their interactions through the daycare, Barbour-Richardson believed that mother was "a really good parent" who was "doing everything and making the right steps for her children."  Barbour-Richardson believed that mother "really loves those girls unconditionally.  She took care of them.  They were bathed.  Their hair was combed.  The baby had diapers and wipes and milk, and she did everything."  She said

31.

that mother called her the first night that child 3 was in the hospital, and that mother "was very worried and she was crying and she was upset."

{¶ 78} Barbour-Richardson was not aware of the 2018 case, but did know that the children were previously in foster care. Regardless, she never had any concerns about mother's interactions with the children, and the children never reported that mother was hurting them.

{¶ 79} On cross-examination, Barbour-Richardson admitted that she did not know that the children were previously abused. She also thought that LCCS took custody of the children because child 3 was admitted to the hospital with seizures and found to have a broken arm; she admitted that she did not "know the full story." When LCCS's attorney asked Barbour-Richardson if she would find it concerning if a child presented to the hospital with each of the injuries child 3 had, she answered "[y]es" each time. And she answered "[n]o" when LCCS's attorney asked if Barbour-Richardson would feel comfortable letting a child go home with a parent in the same situations as mother in this case (for example, if a court determined the parent had abused their child or the child had evidence of being beaten with a belt).

### 4. Mother's testimony

{¶ 80} During her testimony, mother explained that, during the 2018 case, she completed the domestic-violence-survivor classes, only attended two parenting classes because the caseworker told her that she no longer needed the classes as grandmother was

32.

going to get custody, and attended counseling. Although she completed the domestic-violence-survivor classes, mother admitted that she did not feel like she needed the classes, "but [she was] still going to be here because I have to be here." At the time of the disposition hearing, mother had reengaged with counseling and was in the process of enrolling in parenting classes. She also wanted to retake the domestic-violence-survivor classes because she felt that she needed them so that she would recognize the signs of abuse if she began dating again. Additionally, mother reported that she had housing and was still living in the home that she lived in at the time that the children were removed. As far as employment, mother "did some home health care[,] * * * did DoorDashing[,] * * * worked a couple of * * * places[, and] braid[s] hair on the side." At the time of the hearing, mother was "do[ing] DoorDash" for work.

{¶ 81} In response to Monroe-Wells's concerns about the possibility of ongoing domestic violence with father, mother testified that she had three contacts with father after she finished the domestic-violence-survivor classes: once when she unintentionally encountered him at a bar, once when her cousin brought him to her location, and once—in January 2021—when he broke into her home. She said it was "completely not true" that she would be susceptible to domestic violence in the future because she "ha[d] a plan" to move to a new town where her family lived—and that father was unaware of—but she had to wait until she was able to transfer her Section 8 housing benefits.

33.

**{¶ 82}** Regarding the disclosures of abuse that child 1 and child 2 made to foster mother, mother "fe[lt] they were coached" because she was staying at the YWCA at the time and "they don't play none of that stuff," and because she did not "get abusive with [her] children at all. [She was] not an abusive parent." Mother also believed that child 1 and child 2 were "coached" to say that mother pushed child 3 down the stairs, and mother denied that the report was true. Mother claimed that the children were coached regarding the incident with child 3 and the stairs because the children's former foster parent and a caseworker had discussed the allegations against mother in front of the children.

**{¶ 83}** Mother also testified that child 2 reported to her at their most recent visit that the children were being abused at their foster home. Mother testified that child 2 "gets beat up." The foster parents would hold her down and let a little boy punch her in the back and kick her. They also "slap[ child 2] around." Child 2 was required to "carry a tire" and "clean out a ditch," apparently as some type of discipline. As for child 1, they reported that foster mother would tear up child 1's books and homework and tell the school that child 1 did it. The GAL was present at this visit, but child 2 would not talk about these accusations while the GAL was in the room. This visit—exactly one week before the disposition hearing—was the first time that mother had heard any disclosures of abuse by foster mother from the children.

**{¶ 84}** Mother also reported that the children were "very unclean," "[t]heir hair is not combed," foster mother cut their hair, foster mother told child 1 that she planned to

34.

"get rid of [child 1 and child 2] and keep the younger two," and foster mother gave away or burned clothes and gifts that mother sent to the children.  Mother accused foster mother of saying that the children "just lie too much."  In mother's view, foster mother had "nothing positive to say about [the] children."

{¶ 85} Mother reported these concerns to Monroe-Wells the day after the visit, and Monroe-Wells referred the issue to an intake caseworker for investigation.  She also discussed the issues with the GAL, and asked the GAL about getting case plan services because she wanted to "make this work" and felt like "the system [was] failing people like [her] * * *."  Mother wanted the trial court to know that she was "a caring mother, and [was] willing to do anything to make it work for [her] children."

{¶ 86} On cross-examination, mother admitted that she told LCCS during the 2018 case that she caused the injuries to child 1 and child 2, but claimed that father was the real culprit.  She also admitted that father was not around in December 2020 when child 3 was injured, but the child was going to daycare every day.  Mother once again claimed that she never noticed any injuries on child 3 before child 3 was hospitalized and could not provide any explanation for the child's body temperature being so low.

### 5. The GAL's testimony

{¶ 87} LCCS's final witness was the GAL.  She testified that she observed mother with the children once, and that mother's interactions with the children were appropriate; she engaged with the children by coloring and playing with them.

35.

**{¶ 88}** The GAL had two meetings with the children at their foster home, and one additional online meeting with child 1. Based on her meetings with child 1 and child 2, the GAL determined that child 1 "half wanted to go home and half didn't want to go home." Her reason for not wanting to go home was that "[i]t's not safe." The GAL also determined that child 2 did not want to go home because she did not "feel safe." Both children wanted to stay at the foster home because "they're comfortable where they are for the moment * * *." Child 3 and child 4 were not able to express their wishes because they were nonverbal.

**{¶ 89}** The GAL recommended that LCCS be awarded permanent custody of the children. She reasoned that

> [b]ased on [her] investigation, [her] concern goes back to 2018 when the children were removed from mom's care and the beatings, the injuries that they had sustained prior to that removal. And then mother's lack of followthrough [sic] with case plan services.
>
> Custody was awarded to grandma. The children were in grandma's care and grandma turns them over to mom, and mom hadn't rectified the problem that caused the removal in the first place. So the kids were in mom's care for four months and we have [child 3] back in the hospital with severe injuries, and then the children have discussed, divulged significant

36.

abuse while in the care of mom. So [she had] significant concerns about

the children being returned to their mother's care.

The GAL's concerns included (1) child 2's allegations of sexual abuse against father; (2) all of the injuries found on child 3 when she was admitted to the hospital; (3) the children's report to the GAL that child 3 "would have other injuries, and mom would use her nail glue to glue them together * * *"; (4) child 1's report that mother threw child 3 down the stairs because child 3 was "slow"; (5) the older children reporting that they had to ride in the trunk of the car when they stayed with a pastor before LCCS took custody of them because the car did not have enough seats for the pastor's family, mother, and all of the children; (6) child 1's disclosure that mother would occasionally make child 1— who was seven years old at the time of the disposition hearing—drink Hennessy or Patron with her; (7) child 1 and child 2's disclosures that father would hold them up so that mother could punch them in the stomach and that mother would sit on their heads and hit their bodies; and (8) child 1 and child 2 being worried about child 4, who was almost two years old, because "when you turn 2, is the age that you can start being beat [sic]." The GAL also found it concerning that child 1 was able to tell her, step by step, "how to apply for Section 8 benefits and welfare. * * * [Child 1] told [the GAL] this is where you go this is what you need to do, this is what you have to show. So she was 7 and knows."

37.

{¶ 90} The GAL also addressed the children's special needs.  She said that there were concerns that child 3 might be autistic, but she was too young for testing.  She was currently in speech, occupational, and physical therapy.  Both child 3 and child 4 were receiving services through Early Intervention, but neither had any specific diagnoses of special needs that the GAL was aware of.  The children were also in counseling.

{¶ 91} After taking all of these things into consideration, and determining that grandmother was not an appropriate placement because she had returned the children to mother despite "understanding what they went through initially * * *[,]" the GAL determined that awarding permanent custody to LCCS was in the children's best interest.  She also believed that the children should stay together.

{¶ 92} On cross-examination, the GAL said that she thought that the children disclosed the abuse to her—when they had not disclosed any abuse to Barbour-Richardson, whom they had known longer—because they were no longer in mother's care and felt comfortable enough to talk to her because "they have rules that they're not allowed to talk to caseworkers.  And since [the GAL is] not a caseworker, they can talk to [her]."  The children did not tell the GAL whether mother and father holding them down and hitting them happened before mother lost custody in the 2018 case or after the children returned in 2020.  The GAL did not probe further into child 2's allegations of sexual abuse by father because she realized that a trained forensic interviewer was a more

38.

appropriate person to question child 2. This was to ensure that the child was not "prompted, led, suggested."

{¶ 93} Regarding child 1's conflicted feelings about going home to mother, the GAL said that "all children love their mothers. * * * [Child 1] would like to be with her mother, yet she doesn't want to be there because of what transpires when they're there, but she loves her mother."

{¶ 94} When the GAL spoke to mother after the children disclosed the abuse in the home, she described mother as "congenial," "very chatty, [and] appropriate * * *." She did not seem evasive. Mother talked about her life and situation, and told the GAL that she wanted her children back. The GAL believed that mother loved the children and could benefit from case plan services.

### 6. Mother's rebuttal testimony

{¶ 95} After the parties each rested, and over LCCS's objection, the trial court permitted mother to testify to rebut new information that came out during the disposition hearing. First, to rebut foster mother's testimony about child 1's progress in school, mother testified that child 1 got good grades and did not have behavior problems at school when she was living with mother. She also testified that child 3 and child 4 "love the tub and they love to play with they [sic] toys in the tub" to rebut foster mother's testimony that the younger girls were afraid of bathing. Finally, mother denied ever doing anything to hurt her children.

39.

## 7. Disposition decision

{¶ 96} In its May 10, 2021 judgment entry, the trial court terminated mother's parental rights and awarded permanent custody to LCCS. In doing so, the court determined that LCCS had shown by clear and convincing evidence that (1) under R.C. 2151.353(A)(4), the children could not be placed with either parent within a reasonable time and should not be placed with either parent; (2) under R.C. 2151.414(D)(1), it was in the best interest of each child to grant permanent custody to LCCS; and (3) it would be contrary to each child's best interest to be reunified with either parent.

{¶ 97} Under R.C. 2151.414(E)(1), the court concluded that, notwithstanding reasonable case planning and diligent efforts by LCCS to assist mother in remedying the problems that initially caused the children to be placed outside the home, mother had failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside of the home. Specifically, the court found that mother "did not internalize []or use the information she learned in her domestic violence program to avoid violent relationships * * *" because she continued to have contact with father after completing the program; she did not secure stable housing until approximately two weeks before the children were removed in December 2020, and was living at the YWCA from before she got the children back in August 2020 until early December 2020; and she never reengaged in a parenting program.

40.

{¶ 98} Under R.C. 2151.414(E)(4), the court found that mother demonstrated a lack of commitment toward the children by her actions showing an unwillingness to provide an adequate permanent home for the children. Mother demonstrated this lack of commitment by continuing to have a relationship with father, who not only abuses mother, but also is accused of assisting mother with inappropriately punishing the children.

{¶ 99} Under R.C. 2151.414(E)(15), the court found that mother committed abuse against the children, as described in R.C. 2151.031, or caused or allowed the children to suffer neglect, as described in R.C. 2151.03, and the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the children's placement with mother a threat to the children's safety. Specifically, the court noted that the children were adjudicated abused in the 2018 case, and the injuries in that case were serious, including belt marks on one child's face. Then, just a few months after mother regained custody of the children, child 3 went to the hospital in a "life-threatening condition * * *." The court determined that the "seriousness of the injuries coupled with the likelihood of recurrence if any of these children were to be placed with Mother would be a threat to the child's [sic] safety."

{¶ 100} Finally, the court found, under R.C. 2151.414(D)(1) that granting LCCS permanent custody was in the children's best interest because the caseworker and GAL both testified that permanent custody was in the children's best interest, the children were

41.

in an appropriate foster home that was meeting their needs, the children deserved a "legally safe, secure, and permanent environment[,]" and that the children should remain as a sibling group. The court also found that LCCS made reasonable efforts to reunify the family based on its efforts in the 2018 case, and that "[t]hese children do not have to wait indefinitely for parents to remedy the reasons for their removal."

{¶ 101} After considering all of the evidence and making detailed findings, the trial court awarded permanent custody of the children to LCCS and terminated mother's parental rights. Notably, in its findings of fact, the court determined that "Mother's explanations, for numerous circumstances, were not believable. For example, this Court does not find it credible that the children were coached into making certain statements and/or disclosures."

{¶ 102} Mother now appeals, raising one assignment of error:

The trial court erred in granting permanent custody of L.K. Z.K. M.W. H.K.to [sic] the Lucas County Children Services Board as it was against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 103} In her assignment of error, mother argues that the trial court's decision is against the manifest weight of the evidence because the trial court did not find that any factors in R.C. 2151.414(E) applied, and there were plausible alternative explanations for

42.

child 3's injuries, so the trial court erred in finding that mother abused child 3.[3] LCCS

responds that all of the trial court's findings are supported by the evidence, so the trial

court did not err by granting permanent custody to the agency.

### A. Law of permanent custody

{¶ 104} As a preliminary matter, LCCS points out that mother's brief relies on

R.C. 2151.414(B)(1)(a)-(d), which the agency argues is inapplicable to this case because

the agency moved for permanent custody of the children under R.C. 2151.353. We

agree. The procedures outlined in R.C. 2151.414 apply only to a motion for permanent

custody filed under R.C. 2151.413. R.C. 2151.414(A)(1) ("Upon the filing of a motion

*pursuant to section 2151.413 of the Revised Code* for permanent custody of a child * *

*.") (Emphasis added.) In contrast, R.C. 2151.353(A)(4) provides that awarding

permanent custody to a children services agency is one of the disposition options

available to a trial court that adjudicates a child abused, neglected, or dependent. Under

this section, the court does not have to consider the factors in R.C. 2151.414(B), but it

must still consider the factors in R.C. 2151.414(E) and determine whether awarding

permanent custody to the agency is in the child's best interest under R.C.

2151.414(D)(1). R.C. 2151.353(A)(4).

{¶ 105} LCCS's amended complaint sought permanent custody of the children

---

[3] Mother does not challenge the trial court's findings of neglect under R.C. 2151.03, dependency under R.C. 2151.04, or the children's best interests under R.C. 2151.414(D)(1). Thus, we will not address those portions of the trial court's decision.

43.

under R.C. 2151.353(A)(4), not R.C. 2151.413. Accordingly, we will confine our analysis to the factors required under R.C. 2151.353.

{¶ 106} Under R.C. 2151.353(A)(4), if a trial court adjudicates a child abused, neglected, or dependent, the court can grant permanent custody of the child to a children services agency only if the court determines that (1) factors enumerated in R.C. 2151.414(E) are present that indicate that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent *and* (2) the factors in R.C. 2151.414(D)(1) indicate that granting permanent custody to the agency is in the child's best interest. *In re I.H.*, 6th Dist. Lucas Nos. L-20-1062 and L-20-1080, 2020-Ohio-4853, ¶ 33, citing *In re B.K.*, 6th Dist. Lucas No. L-17-1082, 2017-Ohio-7773, ¶ 16.

{¶ 107} All of the court's findings must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

{¶ 108} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable

44.

inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But while we review the evidence and consider the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10. We will not overturn a decision on permanent custody that is supported by some competent, credible evidence in the record upon which the trial court could have formed a firm belief as to all of the essential permanent-custody findings. *I.H.* at ¶ 34, citing *In re Denzel M.*, 6th Dist. Lucas No. L-03-1337, 2004-Ohio-3982, ¶ 8.

### B. Abuse finding

{¶ 109} The first requirement for the court to award permanent custody under R.C. 2151.353(A)(4) is a determination that the child is neglected, abused, or dependent. Mother argues that the trial court's finding that she abused child 3 is against the manifest weight of the evidence because there are other explanations for all of the injuries discovered at the hospital in December 2020.

45.

{¶ 110} As relevant here, a child is "abused" if she "[e]xhibits evidence of any physical * * * injury * * *, inflicted other than by accidental means, or an injury * * * which is at variance with the history given of it." R.C. 2151.031(C). In its adjudication entry, the trial court found that the evidence clearly and convincingly supported a finding that child 3 was abused. Our review of the record shows that the trial court's decision is supported by the manifest weight of the evidence.

{¶ 111} The trial court found that child 3 was abused because her injuries did not match the history given by mother. Mother "failed to offer any plausible explanation for how [child 3] became hypothermic[,]" saying only that the child was in a warm bath for approximately 20 minutes. But the court believed Schlievert's testimony that child 3's level of hypothermia was not consistent with spending a few minutes in a warm bath and that she was likely immersed in cold water. The trial court's conclusion is supported by the record.

{¶ 112} Although mother testified that she felt child 3 getting colder and colder while she was seizing, the only medical evidence relating to child 3's life-threatening hypothermia was Schlievert's testimony that it must have been caused by some type of prolonged exposure to cold. Schlievert specifically testified that seizures can *raise* body temperature. While he also testified that a seizure that occurs because of a brain injury that damages the area of the brain responsible for regulating temperature might lower body temperature by a few degrees, he was not aware of seizures causing body

46.

temperatures to drop to approximately 20 degrees below the normal range. Importantly, there is no evidence in the record that child 3's seizure was caused by damage to the area of her brain that regulates body temperature, but there is evidence that her prior seizures "were from breath holding and not of brain origin."

{¶ 113} Schlievert also said that mother's explanation of the situation leading to the hypothermia did not "make sense." He testified that it would take some amount of prolonged exposure to cold—though he could not say exactly how much exposure because of all of the variables involved—for a child's body temperature to drop to approximately 20 degrees below the normal range. But he was sure that it would take more than "minutes." Mother told hospital staff that child 3 was not exposed to any cold, but was in a warm bath for about 20 minutes. Schlievert said that a child who was in a warm bath for approximately 20 minutes would not have a body temperature that was 20 degrees below normal. Mother did not present any expert testimony to rebut Schlievert's conclusions, and the trial court specifically determined that Schlievert's testimony was more credible that mother's regarding the source of child 3's injuries. We see nothing in the record requiring us to disturb this finding.

{¶ 114} Mother's attorney questioned Schlievert about other things in child 3's medical history that might have explained a low body temperature, but Schlievert said that none of them would cause the child's temperature to drop more than a couple of degrees below normal—certainly not to the life-threateningly-low level of 79 degrees.

47.

Mother did not offer any evidence to counter Schlievert's medical opinion on this point.

{¶ 115} Additionally, there was testimony from foster mother that child 1 and child 2 disclosed that mother used "ice cold baths" as punishment for the children and that child 2, child 3, and child 4 were afraid of taking baths when they first came to the foster home.

{¶ 116} Taken together this is sufficient to support the trial court's finding of abuse.

{¶ 117} We note that mother also argues that there are alternate explanations for child 3's other injuries, making the trial court's finding of abuse against the manifest weight of the evidence. The trial court relied only on the unexplained hypothermia to adjudicate child 3 abused, however. Thus, the fact that plausible alternate explanations might exist for the other injuries is irrelevant to our determination of whether the trial court's finding of abuse was against the manifest weight of the evidence.

{¶ 118} Because the trial court's finding of abuse is supported by the evidence, we now turn to the court's consideration of the factors in R.C. 2151.414(E).

### B. R.C. 2151.414(E) findings

{¶ 119} Mother argues that the trial court failed to make the necessary findings under R.C. 2151.414(E), so the court's decision is not supported by the manifest weight of the evidence. We disagree.

{¶ 120} "[A] court need only find *one* factor under R.C. 2151.414(E) to support a

finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent * * *."  (Emphasis added.)  *In re Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, ¶ 38; *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 50, citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

**{¶ 121}** As relevant here, the court found that R.C. 2151.414(E)(1), (4), and (15) were applicable to mother.  The statute provides:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> * * *

49.

(4) The parent has demonstrated a lack of commitment toward the child by * * * actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

R.C. 2151.414(E).

{¶ 122} As a preliminary matter, we note that R.C. 2151.414(E) directs a trial court to enter a finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent when it finds *any* of the enumerated factors applicable. Mother's brief addresses only the factors in (E)(7) to (11)—none of which the trial court found applicable to her. Thus, even if the trial court erred in concluding that (E)(1), (4), or (15) was applicable to mother, mother is not challenging those findings, and if any one of them is supported by competent, credible evidence, we will uphold the trial court's finding that the children could not be placed with mother within a reasonable time or should not be placed with mother. *See In re*

*Destiny C.*, 6th Dist. Lucas No. L-08-1147, 2008-Ohio-5292, ¶ 26 ("A proper finding of any one of the R.C. 2151.414(E) factors is sufficient to sustain a conclusion that the children cannot now, or in a reasonable time, be reunited [with the parents].").

{¶ 123} Despite mother's failure to present arguments about the relevant factors, we will briefly address (E)(15).

{¶ 124} The trial court determined under (E)(15) that mother committed abuse against the children twice: first against child 1 and child 2 in the 2018 case, and then against child 3 in this case. The court noted that child 3's injuries happened just a few months after mother regained custody of the children. The court also found that the children's injuries were serious and included, among other things, a belt mark on child 1's face and child 3's life-threatening hypothermia. The court concluded that "the seriousness of the injuries coupled with the likelihood of recurrence if any of these children were to be placed with Mother would be a threat to the child[ren]'s safety." The court's conclusion is supported by the record.

{¶ 125} In the 2018 case, child 1 and child 2 were found to have a laundry list of injuries, including child 1 having (1) "a large red mark resembling a belt mark on her face"; (2) "bruising, swelling and red marks on both cheeks, her left eye was bruised with slight swelling noted, a cut/scratch on her ear and a raised bump behind her right ear"; and (3) "multiple red marks and bruising on her shoulder, back, and abdomen"; and child 2 having "bruising on the front left side of her neck, on her back, at the base of her skull,

and a scabbed mark across the back of her neck." The trial court's findings of fact clearly state that mother "admitted she had caused the injuries to the children."

{¶ 126} Then, less than four months after mother regained custody of the children, child 3 was taken to the hospital with (1) severe hypothermia; (2) a fresh skull fracture; (3) four healing broken ribs; (4) deep bruises on her hip, buttock, and thigh; and (5) an abnormal finding on her left humerus that, when considered in context with the rest of her injuries, was likely an old fracture.[4] Based on Schlievert's expert medical testimony, each of these injuries was likely a different age (with perhaps the exception of the hypothermia and the skull fracture), and it was highly unlikely that all of them were accidentally inflicted. It was also unlikely that mother's explanations for the injuries were medically accurate. For example, based on Schlievert's testimony, a seizure would not cause a 20-degree drop in body temperature and a fall down the stairs would not cause bruising on highly-padded areas of the body (like the buttocks and thighs) and avoid bruising bonier areas (like the shins and knees), where child 3 did not have any bruising.

---

[4] Even if we accept mother's testimony that child 3 had a problem with her left arm in December 2019 and grandfather's testimony that she had a problem with it in June 2020—leading to an inference that the December 2020 finding on the humerus was either not caused by a fracture or was misinterpreted as a healing fracture rather than a deformity left by a fully-healed fracture—and exclude this injury from consideration, there is still more than sufficient evidence of serious injury to child 3 to support the trial court's findings under R.C. 2151.414(E)(15).

52.

{¶ 127} We agree with the trial court that the children's injuries were sufficiently serious and the abuse in this case happened so soon after mother regained custody that placing the children with mother would be a threat to their safety. Therefore, we find that the trial court's determination under (E)(15) is supported by clear and convincing evidence and is not against the manifest weight of the evidence.

{¶ 128} Moreover, the trial court was only required to make a finding under one of the R.C. 2151.414(E) subsections to support granting permanent custody to LCCS. *Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, at ¶ 38. Because the trial court's (E)(15) determination is supported by the manifest weight of the evidence, we need not address the court's findings under (E)(1) and (4). Accordingly, we find that the trial court did not err in determining that the children could not or should not be placed with mother.

{¶ 129} Mother's assignment of error is not well-taken.

### III. Conclusion

{¶ 130} We have thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. We find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's assignment of error is without merit.

53.

{¶ 131} Therefore, the May 10, 2021 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.

_____

Myron C. Duhart, P.J.
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.