[Cite as *In re J.J.*, 2026-Ohio-1269.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re J.J.

Court of Appeals No. L-25-00257,
L-25-00258

Trial Court No. 25305577

**<u>DECISION AND JUDGMENT</u>**

Decided: April 8, 2026

* * * * *

Janna E. Waltz, for appellee.

Christopher S. Clark, and
Laurel A. Kendall for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** This is a consolidated appeal by appellant, D.S., the mother of J.J., and

appellant, B.J, father of J.J., from the November 12, 2025 judgment of the Lucas County

Court of Common Pleas, Juvenile Division, granting permanent custody of J.J. to

appellee, Lucas County Children's Services ("LCCS" or "the agency").[1] For the reasons that follow, we affirm the judgment.

{¶ 2} Father sets forth one assignment of error:

> The trial court abused its discretion when it found that father had failed to provide clear and convincing evidence that, notwithstanding the prior termination, that he can provide a legally secure permanent placement and adequate care for the health, welfare and safety of the child, when there was still significant time left on the case, pursuant to R.C. 2151.414(D) and R.C. 2151.415.

**Background**

{¶ 3} J.J. was born on June 11, 2025, to mother and father (collectively "parents"); parents were not married. Mother has four other children, two of whom are father's children. In addition to his children with mother, father has children by other women. Prior to J.J.'s birth, parents lost permanent custody of their common children, and neither mother nor father has custody of any of their children. After J.J.'s birth, the agency was notified and became involved due to parents' loss of permanent custody of their children as well as on-going domestic violence ("DV") and substance use issues.

{¶ 4} On June 13, 2025, the agency initiated the underlying case with the filing of its "Complaint in Dependency: Permanent Custody and Motion for Shelter Care Hearing" in which it alleged that J.J. was a dependent child pursuant to R.C. 2151.04. The complaint detailed mother's long history with the agency and set forth concerns that

---

[1] While mother filed an appeal, her appellate brief was stricken, and she failed to file another brief. Therefore, only father's appellate brief is properly before this court. Mother will be mentioned when pertinent to matters in father's appeal.

2.

existed in prior cases, including DV, mental health issues and substance abuse, which led to J.J.'s siblings' removal. The complaint described the case plan services previously offered to parents and noted both of them failed to meaningfully engage in those services. In addition, the complaint set forth that mother lost legal custody of her oldest child and permanent custody of her other three children. The agency requested that the trial court do the following: hold an emergency shelter care hearing and find it necessary to place J.J. in shelter care; schedule and hold an adjudication hearing and find J.J. dependent; proceed to a dispositional hearing where, pursuant to R.C. 2151.353(A)(4), the parents' rights would be permanently terminated and permanent custody of J.J. would be awarded to the agency.

{¶ 5} Also on June 13, 2025, a shelter care hearing was held. Mother attended the hearing and was in agreement with the agency receiving interim temporary custody of J.J. Father did not attend the hearing. Thereafter, the trial court issued an order awarding interim temporary custody of J.J. to the agency. J.J. was placed in foster care.

{¶ 6} On June 18, 2025, Attorney Nida Salahuddin-Mohler was appointed as the guardian ad litem ("GAL") to protect J.J.'s interests.

{¶ 7} On October 24, 2025, the trial court conducted an adjudicatory hearing followed by the dispositional hearing on the agency's complaint. Parents attended the court proceedings, but neither parent testified.

3.

**Adjudicatory Hearing**

{¶ 8} Makaya Walker, an agency assessment caseworker, testified to the following. She met with mother at the hospital following J.J.'s birth and mother said she planned to engage in mental health services. Mother had tested positive for marijuana at the beginning of her pregnancy but tested negative when J.J. was born. Walker's concerns included that mother was not engaged in mental health services, did not have her own housing, used marijuana and had DV issues with father.

{¶ 9} Case plan services had been offered to parents in prior cases including undergoing a dual assessment and following recommendations, as well as DV and batterers services for father. Father completed his first dual assessment in 2022, and he was recommended for substance abuse services. He started intensive outpatient services ("IOP") but did not complete IOP. Walker believed father completed DV services. Mother did not successfully complete case plan services in the prior cases.

{¶ 10} After J.J. was born, Walker met with father at mother's home and tried to give him information about the staffing and court hearing, but he said he would not participate until DNA had been completed. DNA testing was completed, and father was found to be J.J.'s biological father.

{¶ 11} The agency offered an exhibit consisting of certified Lucas County Juvenile Court documents, which exhibit was admitted into evidence without objection from father's attorney. The exhibit included complaints, judgment entries and other documents from cases concerning the custody of mother's four other children, two of whom are father's children, and case plan services previously offered to parents.

4.

{¶ 12} The trial court adjudicated J.J. dependent.

**Dispositional Hearing**

{¶ 13} Hannah Jerik, an ongoing caseworker for the agency, and the GAL testified and various exhibits were admitted, without objection from father's lawyer. The exhibits included certified Toledo Police Department criminal records for parents, certified Toledo Municipal Court criminal and traffic case records for parents and the GAL's report.

{¶ 14} Jerik testified that the agency did not offer case plan services to parents, but parents were encouraged to engage in services, which would include agency issued referrals if requested. Jerik noted the agency's concerns, that father was using substances, he was not surrounding himself with safe people and it was unknown if his house would be appropriate for a child, and recommendations, that the agency was requesting permanent custody of J.J. based on a belief that it would be in J.J.'s best interest because parents had not remedied the situations that had arisen in prior cases. Jerik testified, regarding father's substance use, that she "would not be opposed at all to referring father to services, he just hasn't asked and [she hasn't] pursued." Jerik acknowledged father visited J.J., and no concerns were reported.

{¶ 15} The GAL testified she was familiar with the family and was involved in prior cases. She was appointed to this case in June 2025, and performed an independent investigation which consisted mostly of examining notes related to the history of the case and reviewing documents filed with the court. She saw J.J. and spoke with father, but not mother. The GAL told father to make sure he completed prior case plan services so he

5.

and mother would have a chance to get J.J. back.  The GAL did not have the opportunity to observe either parent with J.J., but she did observe J.J. in her placement, where J.J. is "doing great, don't have any concerns for her."  J.J. was meeting all of her milestones, was bonded to the placement and others in the home and the placement was willing to adopt J.J.

{¶ 16} The GAL opined neither parent was able to provide a safe, stable, and permanent environment for the child due to parents' DV history, past substance abuse issues and housing issues, none of which had been resolved.

{¶ 17} In her report, which was admitted into evidence without objection, the GAL detailed the agency's history with the family, starting in 2017, with mother's first child, and progressing through each subsequent child.  Father's first child with mother was born in 2022, and there were concerns with mother and father using drugs.  Father's second child with mother was born in 2023, then J.J. was born in 2025.  Case plan services were offered to parents, including a dual diagnostic assessment, housing and batterers intervention for father; neither parent made significant progress.  There were on-going concerns of substance abuse by father since he did not complete services.

{¶ 18} The GAL recommended permanent custody of J.J. be given to the agency because she did not believe parents did the case plan services they need to have J.J. placed with them, citing concerns about prior DV and substance abuse issues.  The GAL was asked if she believed parents would complete services if they were given more time, and the GAL replied that she "struggled with this one because if you're provided an opportunity anything is possible; however, the past shows us that they haven't."

6.

{¶ 19} Following the witnesses' testimony and the admission of exhibits, the trial court found the agency proved, by clear and convincing evidence, that permanent custody of J.J. should be awarded to the agency, as it was in J.J.'s best interest given that parents did not reach their burden of proving that changes from prior cases warranted them receiving custody of J.J.

{¶ 20} In its November 12, 2025 judgment entry, the trial court found J.J. was dependent as the agency established by clear and convincing evidence that parents are unable to care for J.J. The court further found that J.J. cannot or should not be placed with either parent within reasonable time based on R.C. 2151.414(E)(1), (2), (4) and (11). The court also found that the agency met its burden by providing clear and convincing evidence that a grant of permanent custody is in J.J.'s best interest, in accordance with R.C. 2151.414(D)(1).

{¶ 21} Appeals were filed, but only father's appeal will be considered.

## Applicable Permanent Custody Law

**R.C. 2151.353(A)(4)**

{¶ 22} R.C. 2151.353(A)(4) allows a children services agency to seek a disposition of permanent custody of a child when the agency files a complaint alleging that a child is dependent, without first offering case plan services to parents or a path toward reunification. *In re L.K.*, 2022-Ohio-1857, ¶ 104 (6th Dist.); *In re T.H.*, 2025-Ohio-344, ¶ 34 (6th Dist.), citing *In re S.J.*, 2024-Ohio-5137, ¶ 23 (6th Dist.). *See also In re Baby Girl Baxter*, 17 Ohio St.3d 229, 234 (1985) ("R.C. 2151.412 [concerning case

7.

plans] does not require that a court order a reunification plan when it makes disposition pursuant to R.C. 2151.353(A)(4).").

{¶ 23} Pursuant to R.C. 2151.353(A)(4), when a trial court adjudicates a child dependent, the court can only grant permanent custody of the child to an agency if the court makes a two-prong determination: (1) at least one factor in R.C. 2151.414(E) is present, indicating that the child cannot or should not be placed with a parent within a reasonable time; and (2) the factors in R.C. 2151.414(D)(1) show that granting permanent custody of the child to the agency is in the child's best interest. *In re L.K.* at ¶ 104.

**R.C. 2151.414(E)**

{¶ 24} Here, the trial court found R.C. 2151.414(E)(1), (2), (4) and (11) applied, although only finding one (E) factor exists is sufficient to support an award of permanent custody to the agency. *In re S.J.* at ¶ 29. We will confine our examination to only one factor, R.C. 2151.414(E)(11), as it relates to father.

{¶ 25} R.C. 2151.414(E) states:

In determining at a hearing . . . whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing . . . that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
. . .

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child . . . and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

8.

{¶ 26} The trial court's findings under R.C. 2151.414 must be based on clear and convincing evidence. *In re J.S.*, 2025-Ohio-17, ¶ 34 (6th Dist.). "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 27} A finding under R.C. 2151.414(E)(11) places the burden on father to present clear and convincing evidence proving that he can provide a legally secure permanent placement and adequate care for the child's health, welfare, and safety. *In re N.J.*, 2023-Ohio-3190, ¶ 44 (6th Dist.). Hence, father must essentially rebut a presumption that, because his parental rights were involuntarily terminated as to other children, he is not a suitable parent for additional children. *In re M.M.*, 2023-Ohio-3963, ¶ 51 (6th Dist.), citing *In re E.A.*, 2012-Ohio-5925, ¶ 14 (9th Dist.).

**R.C. 2151.414(D)(1)**

{¶ 28} R.C. 2151.414(D)(1) provides:

In determining the best interest of a child at a hearing . . . the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed . . . through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies . . . for [12] or more months of a consecutive [22]-month period . . .;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

## R.C. 2151.414 and R.C. 2151.414(D)

{¶ 29} A trial court's finding that a parent has lost parental rights to another child applies to both prongs of the permanent custody analysis as to (1) whether a child cannot or should not be placed with a parent, R.C. 2151.414(E)(11), and (2) whether permanent custody is in the child's best interest, R.C. 2151.414(D)(1)(e). *In re N.J.* at ¶ 44.

### Trial Court's Judgment Entry

{¶ 30} In its judgment, the trial court set forth the following relevant information:

On October 24, 2025, this Court conducted a hearing on the Complaint for Permanent Custody. Present for this hearing were Makaya Walker, assessment caseworker for LCCS; Hannah Jerik, ongoing caseworker for LCCS; Janna E. Waltz, attorney for LCCS; . . . Mother;[]Peter Field, attorney for Mother; . . . Father [;] John Zima, attorney for Father; and Nida Salahuddin-Mohler, . . . GAL for the above-captioned child. . . .

I. FINDINGS OF FACT

On June 11, 2025, LCCS received a referral alleging that Mother gave birth to this child at Toledo Hospital. . . [and] Mother had been positive for THC during her pregnancy but was negative at delivery. Mother was flagged due to concerns for a previous history with LCCS and other children.

Both LCCS and Lucas County Juvenile Court have a long history with this family. Mother has four other children. She does not hold custody of any of them. Legal custody of a half-sibling to this child was awarded to his father. . . Permanent custody of another half-sibling to this child was

awarded to LCCS in April 2022. . . Permanent custody of [parents'] two other children was awarded to LCCS on February 12, 2024. . .

Concerns that initially led to the sibling[]s['] removals included. . . Father's substance use, lack of appropriate housing, and prior involvement with LCCS.

Both parents were offered case plan services in prior cases. Mother was offered a dual assessment and to follow recommendations, [DV], anger management, and parenting. Mother did not successfully complete case plan services in any of her prior cases.

Father's case plan services included a dual assessment, to follow all recommendations, and [DV] services. Father failed to successfully complete substance abuse services. Father has a prior history of cocaine and marijuana use. There are ongoing concerns that [he] is still using substances.

Case[]worker Makaya Walker was assigned to investigate the referral in this matter. Ms. Walker testified that she met with Mother at the hospital . . . Mother reported that she and Father have a history of [DV], but they are no longer in a relationship. . .
Ms. Walker met with Father to discuss the referral. . . [but he] did not want to discuss the referral until genetic testing had been completed. Genetic testing was completed, and [he] was found to be the biological father . . .

LCCS continues to have concerns with both parents due to their failure to successfully complete case plan services and remedy the prior concerns. LCCS continues to have the same or similar concerns for the parents that were present in their prior cases.

A Complaint in Dependency: Permanent Custody was filed on June 13, 2025. A shelter care hearing was held on that same date, and interim temporary custody of the child was awarded to LCCS.

Hannah Jerik, the ongoing caseworker testified that a case plan was established for this family and the original case plan goal was reunification. She testified that because the case was filed as an original permanent custody case, parents were not formally offered case plan services, but they were encouraged to engage.

Ms. Jerik testified that if Mother were to be offered case plan services, she would be requested to complete a dual assessment and follow all

recommendations, [DV] batterers and [DV] survivors, parenting, and housing. Ms. Jerik testified that she sent a referral for a dual assessment to Unison in July 2025 at Mother's request. . . [but] Mother was [a] no show for the scheduled appointment with Unison on August 18, 2025, and cancelled her appointment on August 25, 2025. . .

. . . Ms. Jerik testified that Mother provided one urine screen during this case, and she was positive for THC. Mother is not currently engaged in substance abuse treatment and there is no record that she has ever successfully completed a substance abuse program.

Ms. Jerik testified that LCCS has ongoing concerns for Mother regarding [DV]. Mother was recently charged with [DV] due to an incident between her and Father on June 28, 2025. It is reported that [she] struck [him] in the face with a sock full of rocks and attempted to stab him with a knife. . . The charges were dismissed at Father's request. Mother has a long history of violent behavior. She spent approximately six months in jail in 2023 for assault on a peace officer. . .
. . .

Ms. Jerik testified that due to the original permanent custody filing, Father is also not on the case plan. She testified that historical concerns for [him] included substance abuse, [DV] and housing. [He] failed to successfully complete case plan services in the prior cases.

Ms. Jerik testified that there are ongoing concerns relating to Father's substance use as he has not previously completed substance abuse services and is not currently engaged in substance abuse services.

Ms. Jerek [sic] testified that there are ongoing concerns for Father regarding [DV] even though there are no recent charges. She testified that along with the incident with Mother in June 2025, [he] was involved in another incident in July 2025 where [he] was intentionally run over by a car. Ms. Jerik testified that these incidents call into question the company that Father is surrounding himself with and his decision making.

It is reported that Father does have independent stable housing, however it is unknown if that housing is appropriate for a child.

Ms. Jerik testified that the child has completed a developmental assessment and has an upcoming appointment with early intervention. She has been referred to occupational therapy and is on a waitlist. There are no other special needs for the child.

12.

As to the child's placement, Ms. Jerik testified that the child is placed in a foster home and doing well in her placement. All her needs are being met by the foster parents. She further testified that the child is extremely bonded to both the foster parents and the other children in the home. The foster parents are willing to adopt the child. She believes that it would be in the best interest of the child for permanent custody to be awarded to LCCS.

Ms. Jerik testified that LCCS has attempted to locate family for potential placement of the child, however at this time no appropriate relatives have been identified for placement. LCCS conducted a home study on a free [sic] home placement, however that home study was denied. Paternal Grandmother indicated an interest in being considered for placement and was scheduled to complete a home study however [she] cancelled the scheduled home study and has failed to reschedule . . .

The [GAL] . . . testified that she performed an independent investigation in her role as GAL. She testified that she was also the GAL in previous cases and has a familiarity with this family. She testified that as part of her investigation, she spoke with Father, attempted to contact Mother, observed the child in [her] placement and reviewed various documents. She testified that despite her efforts, she could not observe the child with either of the parents. She testified that she has observed the child in her placement, and she is doing great with no concerns. All the child's needs are met and she appears to be bonded to the foster parents and the other children in the home. She further testified that foster parents are willing to adopt should permanent custody be granted. She testified that the child is an infant, so she is unable to voice her wishes concerning this matter, but she appears to be happy and comfortable in her placement. Finally, she testified that she believes it to be in the best interest of the child for permanent custody to be awarded to LCCS.

II. CONCLUSIONS OF LAW

A. THIS COURT FINDS THAT THE ABOVE-CAPTIONED CHILD IS A DEPENDENT CHILD. . . pursuant to R.C. 2151.04.
. . .

LCCS established by clear and convincing evidence that [parents] are unable to care for the child. Ms. Jerik testified that [parents] have a long history with the agency and with this Court. Both [parents] have been offered case plan services in prior cases and have failed to successfully

complete those services and demonstrate the necessary changes in order to reunify. LCCS continues to have concerns for mental health, substance abuse, [DV], and housing. Neither parent has engaged in services or demonstrated that they have made the appropriate changes necessary for reunification.

B. [J.J.] CANNOT BE PLACED WITH EITHER PARENT WITHIN A REASONABLE TIME OR SHOULD NOT BE PLACED WITH EITHER PARENT IN ACCORDANCE WITH R.C. 2151.414(E).
. . .

iv. R.C. 2151.414(E)(11).

. . . [T]his Court finds under R.C. 2151.414(E)(11), that both [parents] have had parental rights involuntarily terminated with respect to the child's sibling . . . and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

. . . Father has lost permanent custody of two other children. . . Neither parent successfully completed case plan services in the sibling cases.

Furthermore, neither parent has engaged in services to remedy the concerns in prior cases. LCCS' concerns for the parents are the same in this case as they were in the prior cases. Parents have failed to provide any evidence that despite the prior termination they are able to provide a safe, stable, and permanent environment for this child.

Accordingly, this Court finds that LCCS has presented clear and convincing evidence that [J.J.] cannot be placed with either parent within a reasonable time or should not be placed with either parent for the reasons set forth above.

C. A GRANT OF PERMANENT CUSTODY TO LCCS IS IN THE CHILD'S BEST INTEREST, IN ACCORDANCE WITH R.C. 2151.414(D)(1).
. . .

In arriving at this determination, the Court has considered the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; the wishes of the child, as expressed . . .

through the child's [GAL] . . .; the custodial history of the child; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and/or whether any of the factors in divisions (E)(7) to (11) . . . apply in relation to the parents and child.

. . .

The child has been in substitute care since her release from the hospital. Both the caseworker and GAL testified that the child is very bonded to the foster parents and the other children in the home. She is doing well in the home, and all of her needs are met. The GAL further testified that she believes it would be in the best interest of the child for permanent custody to be awarded to LCCS.

. . .

The GAL testified . . . that based upon her observations of the child, the child appears to be happy in the home of the foster parents.

. . .

Ms. Jerik testified that the agency conducted a search for relatives. A home study was completed for a family friend but was denied. Paternal Grandmother was offered a home study but cancelled it and failed to reschedule. . . [N]o other appropriate relatives have been identified for placement of the child. The child's foster family is willing to adopt should that option become available.

. . .

This Court has found that [R.C.] 2151.414(E)(11) applies to this family in that both [parents] have lost permanent custody of other children and have failed to demonstrate that despite the prior termination of parental rights they are able to provide a safe, stable, and permanent home for the child.

III. JUDGMENT

The Court finds that the GAL conducted an independent investigation, and that investigation supports her conclusion that permanent custody is in the best interest of the child.

The Court finds that LCCS made reasonable efforts to implement and finalize a permanent plan by finding an alternative placement for the child. The Court finds that LCCS made reasonable efforts to remedy the issues that lead to the child's removal and reunify the family. The agency also

made reasonable efforts by identifying an alternative permanent plan of permanent custody and adoption for the child.

The Court finds that LCCS made intensive efforts to identify and engage an appropriate and willing kinship caregiver. However, despite LCCS' intensive efforts, no appropriate and willing kinship caregiver was identified and/or willing to provide a permanent home for the . . . child.

IT IS THEREFORE HEREBY ORDERED, ADJUDGED AND DECREED that permanent custody of [J.J.] . . . is awarded to [LCCS] for adoptive placement and planning. All parental rights in and to the child are hereby terminated.

**Standard of Review**

{¶ 31} In *In re Z.C.*, 2023-Ohio-4703, the Supreme Court of Ohio clarified the standard of review in permanent custody cases, and held:

Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate, depending on the nature of the arguments that are presented by the parties.

*Id.* at ¶ 11. Notably, the Supreme Court rejected the abuse of discretion standard of review. *Id.* at ¶ 18.

{¶ 32} Sufficiency of the evidence and manifest weight of the evidence are "distinct concepts and are 'both quantitatively and qualitatively different.'" *Id.* at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. "We have stated that 'sufficiency is a test of adequacy,' . . . while weight of the evidence 'is not a question of mathematics, but

16.

depends on its effect in inducing belief.'" (Emphasis sic.) *Id.*, quoting *Thompkins* at 387, quoting Black's Law Dictionary (6th Ed. 1990).

{¶ 33} In a manifest weight review, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *In re Z.C.* at ¶ 14, citing *Eastley* at ¶ 20. "The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Awkal*, 95 Ohio App.3d 309, 316 (8th Dist. 1994). Thus, "[a] judgment on permanent custody supported in the record by some competent, credible evidence by which the court could have formed a firm belief as to all the essential elements will not be reversed on appeal as being against the manifest weight of the evidence." *In re I.H.*, 2020-Ohio-4853, ¶ 34 (6th Dist.), citing *In re Denzel M.*, 2004-Ohio-3982, ¶ 8 (6th Dist.).

## Father's Assignment of Error

{¶ 34} Father argues that the trial court abused its discretion when it found that he failed to provide clear and convincing evidence that, notwithstanding the prior termination, he can provide a legally secure permanent placement and adequate care for the health, welfare and safety of J.J. when there was still significant time left on the case, pursuant to R.C. 2151.414(D).

17.

{¶ 35} Father cites *In re T.W.*, 2014-Ohio-5753 (12th Dist.), claiming it is distinguishable. There, the court set forth that "[p]arents in permanent custody actions 'must be afforded every procedural and substantive protection that the law allows.' *In re Hayes*, 79 Ohio St.3d 46, 48 (1997)."[2] *Id.* at ¶ 19. The trial court found that mother, "a drug abuser, had continuously and repeatedly failed to remedy the conditions that led to the removal of the children. The mother also had previously lost custody of another child, a second child died, and the current case was the third case within four years involving T.W." *Id.* at ¶ 3. Father submits the argument centered on the content and form of various pleadings, and the trial court's termination of mother's rights was affirmed.

{¶ 36} Father asserts he was arguably unable to participate in services until a few weeks before the October 24, 2025 hearing because after his vehicle accident in the summer of 2025, he appeared in court for the first time in early October 2025. He contends that R.C. 2151.414(D) allows a child to remain in the temporary custody of the agency for up to two years, but here, the agency filed a complaint in dependency, for permanent custody and shelter care on June 13, 2025, two days after J.J. was born. Father claims the matter proceeded to adjudication on August 12, 2025,[3] and final hearing on October 24, 2025.

---

[2] The next sentence in *In re T.W.* is "[h]owever, courts must liberally construe and interpret the sections of R.C. Chapter 2151, 'so as to provide for the care and protection of children and their constitutional and legal rights.' *In re Shumate*, . . . 2003-Ohio-2509 [(5th Dist.)], quoting *In re Baby Boy Blackshear*, 90 Ohio St.3d 197 (2000), fn. 2." *Id.* at ¶ 19.

[3] While a hearing was held on this date, there is no indication in the record that it was an adjudicatory hearing.

18.

{¶ 37} Father argues that no case plan services were offered to either parent throughout the case, yet he undisputedly had stable housing and was the victim of DV by mother, with no evidence in the record of retribution or retaliation. He submits he went to court and stated he was not fearful of mother and requested that the charges against her be dropped, presumptively in an attempt to support her efforts to be reunited with J.J.

{¶ 38} Father also contends that he was seriously injured by a vehicle in the summer of 2025, but there was no evidence as to any specific party being found responsible for that injury. He claims the injury was serious enough to prevent him from coming to court for a period of time, although he notes he successfully went to supervised visits with J.J. enough times that the agency said there were no issues with his visits. He further asserts there were no urine screens and no testimony that he was difficult to find, uncooperative or unavailable for screens had the agency or GAL attempted to do so. In addition, he argues that no charges were filed against him during the pendency of the case.

{¶ 39} Father submits that this court should find it was unreasonable of the agency and the court to deprive him of the ability to pursue case plan services in this case on such an aggressive and abbreviated timeline, as he only had a matter of weeks to demonstrate any rebuttable presumptions. He maintains that, assuming arguendo, he did not complete services in earlier cases, he was undisputedly unable to pursue services here in order to attempt to rebut the presumption against his loss of custody, based on the undescribed injuries associated with the "rock in a sock" attack by mother in June or July 2025, and having been run over by a vehicle. He notes there was no evidence presented

19.

as to the type and/or severity of his injuries, beyond the fact that he was "laid up" for a "significant amount of time" following the accident. He also observes that he cooperated with paternity testing, which results were available in mid-August 2025. He claims, as a practical matter, if there was a question as to paternity, he was not obligated to participate in anything, or rebut anything, until paternity results were received.

{¶ 40} Father argues this court should find the foregoing events effectively prevented him from participating in any kind of self-directed case plan services from the time of J.J.'s birth through about the end of September 2025, based on his appearance for a pretrial in early October 2025. He claims he only had about two weeks between the pretrial and the date of trial to actually participate in any case plan services.

{¶ 41} Father also asserts there were no injuries to the child, as she was not positive for illegal substances at birth and there was no evidence that she was developmentally delayed, was considered special needs, or required any extraordinary care or services. Father submits this court should find there was no reason why the case needed to be rushed to judgment, as it could have been extended a few months so he could have had a reasonable chance, after his recovery from the car accident, to pursue and participate in services sufficient to demonstrate that he was capable of caring for the child.

**Analysis**

20.

{¶ 42} Based on father's arguments, we will review the trial court's determination of permanent custody under both a sufficiency of the evidence standard and a manifest-weight-of-the-evidence standard.

{¶ 43} The record shows the agency presented undisputed evidence that father's parental rights were terminated regarding two children, J.J.'s siblings. The agency also offered uncontested evidence that J.J.'s needs are currently being met in her placement, she is bonded with the family, and her placement is willing to adopt.

{¶ 44} In the trial court's thorough and comprehensive judgment, the court found, by clear and convincing evidence, that J.J. cannot or should not be placed with father within a reasonable time, under R.C. 2151.414(E)(11), as he had his parental rights involuntarily terminated with respect to J.J.'s siblings, and a grant of permanent custody to the agency is in J.J.'s best interest, in accordance with R.C. 2151.414(D)(1), as R.C. 2151.414(E)(11) applies. The court also found that father failed to provide clear and convincing evidence to prove that despite the prior parental rights terminations, he can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of J.J.

{¶ 45} We find, as did the trial court, that father did not provide clear and convincing evidence that he can adequately care for J.J.

{¶ 46} As noted above, father did not testify, but there was evidence presented, in caseworker Jerik's testimony, that in prior cases, concerns for father were unstable housing, DV and substance use for cocaine, marijuana and THC. When J.J.'s case originated, father lived with paternal grandmother. Later, he indicated he had housing, a

21.

few doors down the street from paternal grandmother's house, but no evidence was presented as to the condition of father's house. Jerik believed father completed DV services and she did not believe that he had any violent charges in the last several years, but father did not complete substance use services and Jerik was unaware of his current substance use because there has not been a dual assessment in this case.

{¶ 47} Jerik testified that in June or July 2025, mother hit father with a rock in a sock. Mother was charged with DV, but father went to court and asked for the charge to be dropped, and it was. Then in July 2025, a large group of people gathered, including mother, and father was involved in an argument and run over by a car. No evidence was offered as to who ran over father or what injuries he sustained.

{¶ 48} Jerik testified that J.J. was referred to occupational therapy and was on a waitlist, but she had no other special needs. Father has level two supervised visits with J.J. on Fridays, he consistently visited with J.J. and there were no concerns.

{¶ 49} There was also evidence presented, via caseworker Walker's testimony, that when J.J. was born, mother did not test positive for marijuana, but at the beginning of her pregnancy, mother tested positive for marijuana.

{¶ 50} And even though it is not supported by evidence, father takes issue with the abbreviated timeline of J.J.'s case, claiming he was deprived of the ability to pursue case plan services. He blames his failure to participate in services in this case on the injuries he sustained when he was hit with a rock in a sock and run over by a car, and the fact that he was waiting on the result of the paternity testing, which was only available in mid-August 2025. Yet, there was no evidence of what injuries or the extent of the injuries he

22.

sustained such that he could establish he was prevented from participating in services, and his explanation that he was waiting on the paternity results does not excuse his failure to engage in services, as he undoubtedly knew it was possible that he was J.J.'s father and he could have participated in services pending the DNA test results, but he chose not to do so. Moreover, father was provided with ample opportunity to take part in services over the past years, and he has been unable or unwilling to partake in services and improve his situation.

{¶ 51} We find that although there was evidence in the record that father visited J.J., he indicated he had a house, and he had no recent criminal charges for violence, this is not enough to show that he can meet the standard of R.C. 2151.414(E)(11), as it was his burden to show that he is capable of providing a legally secure placement and adequate care for J.J.'s health, welfare, and safety, and he failed to do so. Therefore, we find the trial court's R.C. 2151.414(E)(11) finding is supported by sufficient evidence.

{¶ 52} We further find that the trial court's R.C. 2151.414(E)(11) finding is not against the weight of the evidence. The trial court found that father failed to provide clear and convincing evidence to prove that he can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of J.J. The court was in the best position to evaluate the testimony and evidence, and we are bound to construe any evidence which is susceptible to more than one interpretation in a manner consistent with the trial court's judgment. Since the trial court's conclusion that father did not rebut the presumption in R.C. 2151.414(E)(11) is supported by some competent, credible evidence, the judgment is not against the manifest weight of the evidence.

23.

{¶ 53} In light of the foregoing, father's assignment of error is found not-well taken.

{¶ 54} On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Father is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See also 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.
_____
JUDGE

Gene A. Zmuda, J.
_____
JUDGE

Myron C. Duhart, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.